IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RAYMOND ROMO, §
 §
 Plaintiff, §
 §  Civil Action No. 3:18-CV-0570-D
VS. §
 §
WASTE CONNECTIONS US, INC., and §
PROGRESSIVE WASTE SOLUTIONS §
OF TX, INC., §
 §
 Defendants. §

MEMORANDUM OPINION
AND ORDER

Defendants move for summary judgment in this ERISA[1] and breach of contract action. The principal questions presented are whether the plan administrator abused her discretion in denying plaintiff Raymond Romo ("Romo") benefits under an employee severance plan and whether Romo can prove that defendants breached other contractual equity awards. For the reasons that follow, the court grants defendants' motion and dismisses this action by judgment filed today.

I

Romo worked as an accountant in the waste management industry for over 30 years.[2]

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461.

[2]In deciding defendants' summary judgment motion, the court views the evidence in the light most favorable to Romo as the summary judgment nonmovant and draws all reasonable inferences in his favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

In 2013 Romo began working for IESI MD Corporation ("IESI"), which was an operating subsidiary of Progressive Waste Solutions, Ltd. ("Progressive"), as a district controller. After one year, Romo was promoted to the position of area controller. Romo's responsibilities included managing and providing analytical support for internal operations and external transactions, overseeing internal control processes and budgeting, and supervising other controllers and accountants.

In June 2016 Progressive merged with defendant Waste Connections US, Inc. ("Waste Connections"), and IESI became an operating subsidiary of Waste Connections. Prior to the merger, Romo was designated as a participant in several retention and incentive plans. Four of these plans are at issue in the instant case: the 2014 President's Award ("President's Award"); the 2015 Long Term Incentive Plan ("2015 LTIP"); the 2016 Long Term Incentive Plan ("2016 LTIP"); and the 2016 IESI Change in Control Severance Plan – Tier II ("Severance Plan"). The Severance Plan is an ERISA plan designed by defendant Progressive Waste Solutions of TX, Inc. ("Progressive TX") to provide severance protection for certain employees if their employment ended during a fixed protection period (February 2016 through June 2017).

After the merger, Romo continued to work for IESI, but his title changed to division controller, and he directed the accounting and supporting financial functions for a 13-district area. To assist with the transition to Waste Connections, Romo's new direct supervisor, Doug McDonald ("McDonald"), sent another Waste Connections division controller to support and train Romo and his team. By the end of 2016, Romo had "become comfortable"

with Waste Connections' policies and procedures. Ds. App. 50.

A subset of the policies and procedures that Romo understood—and stressed to his staff—was the importance of complying with reporting deadlines. Despite this understanding, Romo missed multiple reporting deadlines. McDonald spoke with Romo in January 2017 about missing deadlines and Romo told McDonald that his team was making a commitment to meet their deadlines, but Romo missed at least one deadline after this conversation.[3]

At a similar time, Waste Connections was in the process of selling its assets in the Washington, D.C. market as part of the original plan of merger with Progressive. The Washington, D.C. districts were part of Romo's 13-district area, and he was asked to assist with the due diligence. Romo complied and completed the due diligence requirements, as well as his regular job functions, without receiving additional, requested support. The transaction closed in mid-February 2017.

After the divestiture of the Washington, D.C. districts, Romo was still responsible for managing accounting functions related to that transaction. A portion of the accounting functions involved reconciling and closing general ledger accounts, and, while performing those functions, Romo identified a cash balance of approximately $400,000 in a zero-balance account. Romo knew that the balance was unacceptably high and that it should have been reconciled. Despite this knowledge and the fact that the balance sheet for the Washington,

---

[3]The parties disagree about the cause and impact of the missed deadlines, but do not dispute that deadlines were missed.

D.C. districts was not complete, Romo signed off on the February 2017 balance sheet as complete. And the next month—again without reconciling the variance in the account—Romo signed off on the March 2017 balance sheet as complete. During this time, Romo did not ask for assistance and he did not note or otherwise maintain documentation about the variance.

In April 2017 Romo, McDonald, and other Waste Connections executives toured the Eastern Region.[4] While on the region tour, McDonald discovered the variance in the zero-balance account. McDonald began investigating the discrepancy and asked Romo for his documentation supporting the cash transfers that were wired during the process of apportioning payments between Waste Connections and the buyer of the Washington, D.C. districts. According to McDonald, no supporting documentation existed for the wires, which made it impossible to properly reconcile the account. McDonald, Romo, and an assistant region controller left the tour in an attempt to determine why the account was not balanced. Ultimately, after spending part of two days working on the account reconciliation, Romo's employment was terminated.

Three months later, in July 2017, Romo's counsel sent a demand letter to IESI in which he requested payment of benefits under the President's Award, 2015 LTIP, 2016 LTIP (collectively, the "Equity Incentive Plans"), and the Severance Plan. Per the terms of the Severance Plan, upon receipt of a written demand for benefits, IESI had 90 days to determine

---

[4]The Eastern Region included, in part, the districts over which Romo was division controller.

whether benefits should be granted. Prior to the expiration of 90 days, in October 2017, Susan Netherton, the plan administrator ("Plan Administrator"), notified Romo's counsel that she had been appointed by IESI to serve as the Plan Administrator for purposes of making the benefits determination. The Plan Administrator also informed Romo's counsel that she was extending the response time, in accordance with the terms of the Severance Plan, by an additional 90 days, to January 13, 2018.

The Plan Administrator did not issue her determination on or before January 13, 2018. As a result, Romo's counsel sent a letter to the Plan Administrator asserting that Romo's administrative remedies had been exhausted because he had not received a claim determination within the time prescribed by the Severance Plan. But on January 23, 2018 the Plan Administrator provided Romo two letters. First, she sent a letter denying Romo's benefits claim under the Severance Plan and explaining the reasons for the denial. Second, she sent a letter explaining that she had also been referred the determination whether to pay Romo under the Equity Incentive Plans, and that, upon her review of the plans and circumstances surrounding Romo's termination, Romo's claims under these plans were also denied. A critical component of the Plan Administrator's denials was her determination that Romo was terminated for just cause as defined in three of the four plans in issue: the Severance Plan, the 2015 LTIP, and the 2016 LTIP.

In March 2018, after additional correspondence between Romo's counsel and counsel for the defendants, Romo filed the instant suit against Waste Connections and Progressive TX. Romo alleges that the defendants wrongfully denied his claim to benefits under the

whether benefits should be granted. Prior to the expiration of 90 days, in October 2017, Susan Netherton, the plan administrator ("Plan Administrator"), notified Romo's counsel that she had been appointed by IESI to serve as the Plan Administrator for purposes of making the benefits determination. The Plan Administrator also informed Romo's counsel that she was extending the response time, in accordance with the terms of the Severance Plan, by an additional 90 days, to January 13, 2018.

The Plan Administrator did not issue her determination on or before January 13, 2018. As a result, Romo's counsel sent a letter to the Plan Administrator asserting that Romo's administrative remedies had been exhausted because he had not received a claim determination within the time prescribed by the Severance Plan. But on January 23, 2018 the Plan Administrator provided Romo two letters. First, she sent a letter denying Romo's benefits claim under the Severance Plan and explaining the reasons for the denial. Second, she sent a letter explaining that she had also been referred the determination whether to pay Romo under the Equity Incentive Plans, and that, upon her review of the plans and circumstances surrounding Romo's termination, Romo's claims under these plans were also denied. A critical component of the Plan Administrator's denials was her determination that Romo was terminated for just cause as defined in three of the four plans in issue: the Severance Plan, the 2015 LTIP, and the 2016 LTIP.

In March 2018, after additional correspondence between Romo's counsel and counsel for the defendants, Romo filed the instant suit against Waste Connections and Progressive TX. Romo alleges that the defendants wrongfully denied his claim to benefits under the

whether benefits should be granted. Prior to the expiration of 90 days, in October 2017, Susan Netherton, the plan administrator ("Plan Administrator"), notified Romo's counsel that she had been appointed by IESI to serve as the Plan Administrator for purposes of making the benefits determination. The Plan Administrator also informed Romo's counsel that she was extending the response time, in accordance with the terms of the Severance Plan, by an additional 90 days, to January 13, 2018.

The Plan Administrator did not issue her determination on or before January 13, 2018. As a result, Romo's counsel sent a letter to the Plan Administrator asserting that Romo's administrative remedies had been exhausted because he had not received a claim determination within the time prescribed by the Severance Plan. But on January 23, 2018 the Plan Administrator provided Romo two letters. First, she sent a letter denying Romo's benefits claim under the Severance Plan and explaining the reasons for the denial. Second, she sent a letter explaining that she had also been referred the determination whether to pay Romo under the Equity Incentive Plans, and that, upon her review of the plans and circumstances surrounding Romo's termination, Romo's claims under these plans were also denied. A critical component of the Plan Administrator's denials was her determination that Romo was terminated for just cause as defined in three of the four plans in issue: the Severance Plan, the 2015 LTIP, and the 2016 LTIP.

In March 2018, after additional correspondence between Romo's counsel and counsel for the defendants, Romo filed the instant suit against Waste Connections and Progressive TX. Romo alleges that the defendants wrongfully denied his claim to benefits under the

Severance Plan and the Equity Incentive Plans. Defendants now move for summary judgement,[5] contending that the Plan Administrator's denial of benefits under the Severance Plan was proper and that Romo cannot establish breach of the Equity Incentive Plans. Romo opposes the motion.[6]

II

Defendants are moving for summary judgment on claims on which Romo has the burden of proof. Because Romo has the burden of proof, defendants' burden at the summary judgment stage is to point the court to the absence of evidence of any essential element of Romo's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once they do so, Romo must go beyond his pleadings and designate specific facts demonstrating that there is a genuine issue of fact. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable trier of fact could find in Romo's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Romo's failure to produce proof as to any essential element of the

---

[5]Defendants also move to strike multiple statements in Romo's declaration. Because the court's decision is not affected even if it assumes that Romo's evidence is admissible, the court overrules the objections as moot. *See, e.g., Davidson v. AT&T Mobility, LLC*, 2019 WL 486170, at *1 n.1 (N.D. Tex. Feb. 7, 2019) (Fitzwater, J.) (following similar approach); *Dall. Police Ass'n v. City of Dallas*, 2004 WL 2331610, at *1 n.4 (N.D. Tex. Oct. 15, 2004) (Fitzwater, J.) (same).

[6]As part of Romo's opposition, he offers some statements about being replaced by "a younger and cheaper" employee, P. Br. 16-17, but Romo does not plead an age discrimination claim or explain why such allegations would have any bearing on his ERISA or breach of contract claims. Thus the court need not address these allegations.

claim renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if Romo fails to meet this burden. *Little*, 37 F.3d at 1076.

III

The court turns first to the question whether Romo can demonstrate that the Plan Administrator abused her discretion by denying Romo's claim to benefits under the Severance Plan.

A

Defendants maintain that the court should apply the abuse of discretion standard of review to the Plan Administrator's denial of benefits under the Severance Plan. Romo contends that *de novo* is the standard to apply. The court concludes that abuse of discretion is the proper standard of review.

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Severance Plan grants the Plan Administrator discretionary authority to determine eligibility for Severance Plan benefits and to interpret the terms of the Severance Plan, meaning that abuse of discretion is the proper standard of review.

Romo contends, however, that *de novo* review is appropriate due to defendants' "failure to render a timely decision" and "violation of one or more requirements of 29

[C.F.R. §] 2560.503-1." P. Br. 20. This is, in effect, an allegation that the Plan Administrator violated ERISA procedural requirements.

> Challenges to ERISA procedures are evaluated under the substantial compliance standard. *Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 256-57 & n.5 (5th Cir. 2005). This means that the "technical noncompliance with ERISA procedures will be excused so long as the purpose of section 1133 has been fulfilled." *Robinson v. Aetna Life Ins.*, 443 F.3d 389, 393 (5th Cir. 2006). The purpose of section 1133 is "to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." *Schneider v. Sentry Long Term Disability*, 422 F.3d 621, 627-28 (7th Cir. 2005).

*Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 539 (5th Cir. 2007), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010).

Romo does not aver—or produce any evidence suggesting—that the Plan Administrator's belated claim denial failed to give him an explanation of the denial or an opportunity for fair review. The undisputed evidence instead shows that this is a textbook case of substantial (although not perfect) compliance. *See Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996) (holding that plan administrator substantially complied with ERISA's procedural requirements despite, *inter alia*, an untimely denial). Moreover, even if the belated claim denial amounted to a lack of substantial compliance, Romo's remedy would not be a modification of the standard of review.[7] Indeed, the Fifth Circuit has

---

[7]In this scenario, Romo's remedy would likely be remand, *see Lafleur v. Louisiana Health Service and Indemnity Co.*, 563 F.3d 148, 157-59 (5th Cir. 2009), but the court does

- 8 -

*refused* to modify the standard of review "based on the administrator's failure to substantially comply with the procedural requirements of ERISA." *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 159 (5th Cir. 2009); *see also Wade*, 493 F.3d at 538 ("Wade has cited no direct authority by the Supreme Court or the Fifth Circuit dictating a change in the standard of review based upon procedural irregularities alone, and we see no reason to impose one.").[8]

Thus the court reviews the Plan Administrator's interpretations and determinations under an abuse of discretion standard. *See Rittinger v. Healthy All. Life Ins. Co.*, 914 F.3d 952, 955 (5th Cir. 2019) (per curiam); *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). At best, Romo appears to challenge the Plan Administrator's factual determination of his claim for benefits, not the Plan Administrator's *interpretation* of the Severance Plan.[9] The court will reverse the Plan Administrator's factual determinations only if the decision is not rational or supported by substantial evidence in the record. *See, e.g., Baker v. Aetna Life Ins. Co.*, 260 F.Supp.3d 694, 700 (N.D. Tex. 2017) (Fitzwater, J.); *Green*

---

not see any basis for remanding to the administrator on the current record.

[8]The Fifth Circuit has expressly declined to answer the question whether flagrant procedural violations of ERISA can alter the standard of review. *See Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 138 (5th Cir. 2016); *Lafleur*, 563 F.3d at 159 (explaining that the Ninth Circuit, sitting en banc, has held that "procedural violations can alter the standard of review from abuse of discretion to de novo," but "express[ing] no opinion" on whether the same would be true in the Fifth Circuit). Romo does not allege—and the evidence before the court does not suggest—that the Plan Administrator's failure to render a timely decision amounts to a flagrant procedural violation; accordingly, the court does not address this open question.

[9]Romo's response does not mention the Plan Administrator's interpretation of the Severance Plan or cite any case law that would allow the court to infer that he is challenging the interpretation.

*v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 1999 WL 417925, at *2 (N.D. Tex. June 22, 1999) (Fitzwater, J.). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (internal quotation marks omitted). "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 140 (5th Cir. 2016) (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 119 (2008)).

B

Romo maintains that he should not be barred from recovery under the Severance Plan because his division was intentionally understaffed and because any mistakes did not cause "substantial injury to Defendants." P. Br. 20. But even crediting Romo's assertions as true, they do not suggest that Plan Administrator's decision was not rational or based on evidence. The Plan Administrator outlined the evidence—and Plan provisions[10]—on which she relied

---

[10]The Plan Administrator explained that, according to the Severance Plan, an employee is only eligible to receive severance benefits if, *inter alia*, he is terminated from employment "without Just Cause." Ds. App. 190. The Plan Administrator also stated that "Just Cause" is defined in the Severance Plan as a circumstance where an employee

> (i) willfully fails to perform his/her duties with the Company or any affiliates; (ii) commits theft, fraud, dishonesty or misconduct involving the property, business or affairs of the

in making her decision. She further explained that she viewed the evidence as establishing that Romo's employment "was terminated due to his exceedingly poor work performance and willful failure to perform his duties." Ds. App. 190. And she maintained that the evidence substantiated a "'Just Cause' termination under the Severance Plan, which preclude[d] Mr. Romo from receiving severance benefits under the Plan." *Id.* at 192. This conclusion is both rational and supported by evidence in the record. Thus the Plan Administrator did not abuse her discretion in denying Romo's claim to benefits under the Severance Plan.

Accordingly, the court grants defendants' motion for summary judgment on Romo's ERISA claim.

IV

The court turns next to the question whether a reasonable trier of fact could find that defendants breached the Equity Incentive Plans by refusing to pay Romo under the plans.

A

"A breach of contract claim under Texas law requires proof of four elements: (1) the existence of a valid contract, (2) plaintiff's performance of duties under the contract, (3)

---

> Company or any of its affiliates or in the performance of his/her duties; (iii) willfully breaches or fails to follow any material term of his or her employment agreement; (iv) is convicted of a crime which constitutes an indictable offense; or (v) engages in conduct which would be treated as cause by a court of competent jurisdiction in the jurisdiction in which the Eligible Employee is employed.

*Id.* (citing the Severance Plan, Ds. App. at 169).

defendants' breach of the contract, and (4) damages to plaintiff resulting from the breach."

*Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F.Supp.2d 866, 872 (N.D. Tex. 2013) (Fitzwater, C.J.) (citation and internal quotation marks omitted), *aff'd sub nom. Motion Med. Techs., L.L.C. v. ThermoTek, Inc.*, 875 F.3d 765 ( 5th Cir. 2017).[11]

> Under Texas law, the court's primary concern when interpreting a contract is to ascertain the parties' intentions as expressed objectively in the contract. In doing so, the court must examine and consider the entire writing in an effort to harmonize and give effect to all contractual provisions, so that none will be rendered meaningless. Language should be given its plain and grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated. Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous, and the court will construe it as a matter of law. A contractual provision is ambiguous when its meaning is uncertain and doubtful or if it is reasonably susceptible to more than one interpretation. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole, in light of the circumstances present when the contract was entered.

*Hoffman v. L&M Arts*, 774 F.Supp.2d 826, 832-33 (N.D. Tex. 2011) (Fitzwater, C.J.) (citing *Bank One, Tex., N.A. v. FDIC*, 16 F.Supp.2d 698, 707 (N.D. Tex. 1998) (Fitzwater, J.)), *aff'd*

---

[11]The Equity Incentive Plans each provide that they are to be "governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein." *E.g.,* P. App. 71 (President's Award). But neither party relies on or invokes Ontario law. Defendants expressly rely on Texas law and explain that "the prima facie elements for establishing a breach of contract claim in Ontario are not materially different from those required under Texas law," Ds. Br. 20 n.6, and Romo does not cite any law in support of his breach of contract claims. The court thus applies Texas law. *See, e.g., Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 n.2 (5th Cir. 2009) (explaining that parties forfeited any choice of law argument by failing to brief any other state's law).

*in part, rev'd in part on other grounds*, 838 F.3d 568 (5th Cir. 2016). "A contract is not ambiguous merely because the parties have a disagreement on the correct interpretation." *REO Indus., Inc. v. Nat. Gas Pipeline Co. of Am.*, 932 F.2d 447, 453 (5th Cir. 1991) (footnote omitted). Courts are to construe contracts "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

B

Romo contends that defendants breached each of the Equity Incentive Plans—the President's Award, the 2015 LTIP, and the 2016 LTIP—by refusing to pay him as required under the plans.

1

Regarding the President's Award, defendants maintain that Romo was not entitled to receive any shares because he was not employed at the vesting date. The President's Award provides that "the [shares awarded to Romo] will cliff vest three years after the grant date, the vesting date is April 1, 2018," and that the employee "must be employed on the vesting date in order to receive the value of the shares." P. App. 64.[12] The President's Award also

---

[12]"Cliff vesting is the process by which employees earn the right to receive full benefits from their company's qualified retirement plan account at a specified date, rather than becoming vested gradually over a period of time." *Cliff Vesting*, Investopedia (Apr. 12, 2019), https://www.investopedia.com/terms/c/cliffvesting.asp.

made clear that "[d]etermination of the final payment is at the discretion of the CEO." *Id.*

Romo was terminated from employment prior to the vesting date. But he avers that the 2016 merger between Progressive and Waste Connections constitutes a "Change of Control" that caused the shares to "become fully vested immediately" as a result of the terms of the 2015 Equity Retention Plan. *Id.* at 74. The President's Award does provide that its shares "are governed by" the text of the 2015 Equity Retention Plan. *Id.* at 64. Defendants contend, however, that the change-of-control provision does not modify the vesting date provided in the President's Award letter.

Whether or not the shares vested upon a change of control, Romo's termination triggered a "forfeit[ure of] all rights, title and interest with respect to all Awards." *Id.* at 74. Romo acknowledges this termination provision but posits that it means only that "termination before vesting would forfeit such an award." P. Br. 20. Yet this termination provision draws no distinction between vested and unvested awards—or between a termination with or without just cause. The plain language of the President's Award letter (i.e., that the CEO has discretion to determine the final payment) and the 2015 Equity Retention Plan (i.e., that a termination triggers forfeiture of all awards) thus can only be construed as prohibiting Romo from recovering the President's Award. Accordingly, the court grants summary judgment in favor of defendants on Romo's claim for breach of the President's Award.

2

As to the 2015 and 2016 LTIPs, defendants contend that Romo is not entitled to receive any shares because he was terminated for just cause. Romo opposes this position on

- 14 -

two grounds: first, that he was terminated without just cause; and, second, that regardless whether or not he was terminated for just cause, he should have been paid the share value because the shares vested upon consummation of the merger in 2016.

i

The court begins with the plain language of the LTIPs. Both the 2015 LTIP and the 2016 LTIP provide that just cause means that the plan participant:

> (i) willfully fails to perform his duties with the Corporation; (ii) commits theft, fraud, dishonesty or misconduct involving the property, business or affairs of the Corporation or any of its affiliates or in the performance of his/her duties; (iii) willfully breaches or fails to follow any material term of his or her employment agreement; (iv) is convicted of a crime which constitutes an indictable offence; or (v) engages in conduct which would be treated as cause by a court of competent jurisdiction in the jurisdiction in which the Participant is employed.

P. App. 25-26 (2015 LTIP); *id.* at 47-48 (2016 LTIP). And if the employment of a plan participant is terminated for just cause, "the Participant shall forfeit all rights, title and interest with respect to all unvested Awards. In addition, all of the vested Options and tandem Share Appreciation Rights held by the Participant shall immediately terminate in their entirety and shall thereafter not be exercisable to any extent whatsoever." *Id.* at 32 (2015 LTIP); *id.* at 54 (2016 LTIP).

Defendants maintain that the uncontroverted evidence—including deposition testimony from Romo admitting to missing deadlines and dishonest acts—shows that Romo was terminated for just cause, which precludes him from recovering under either LTIP.

Romo responds that he was not terminated for just cause because he was never placed on a performance improvement plan or other written disciplinary plan and because extenuating circumstances exist that, in effect, excuse his accounting mistakes.

The undisputed evidence shows that although Romo was responsible for—and understood the importance of—ensuring that various reports were regularly and timely submitted, he nonetheless missed multiple reporting deadlines. The undisputed evidence further shows that at least one of the missed deadlines occurred after speaking with McDonald about the need to meet deadlines. Moreover, Romo does not dispute that he signed off on February and March 2017 balance sheets as having "no variance" despite *knowing* that there was a variance.

Romo points to a variety of extenuating circumstances, but does not point to any evidence that raises a genuine issue of material fact on the issue of just cause. *See, e.g., Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) ("Conclusory allegations unsupported by specific facts . . . will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any significant probative evidence tending to support the complaint.'" (quoting *Anderson*, 477 U.S. at 249 (internal quotation marks omitted))). In fact, much of Romo's argument relies on an attempt to read additional requirements into the contractually defined term "just cause."

For example, Romo avers that his "termination could not have been for any 'willful' breach of employment duties without adequate prior warning specific to some misconduct

leading to [his] termination." P. Br. 3. But no "prior warning" requirement is present in the definition of just cause (or anywhere else in the Severance Plan for that matter). And even if "prior warning" were required, Romo conceded in his deposition testimony that McDonald spoke with him about the need to meet deadlines, but that he missed at least one deadline after this conversation.

Romo also states that it is his *belief* that he was terminated without cause because he was "intentionally understaffed" and because "[t]here was no material adverse effect on the accounting records." *Id.* at 17. As with the "prior warning" argument addressed above, there is no requirement in the definition of just cause that there be a "material adverse effect" on particular records. And although crediting Romo's statement that he was intentionally understaffed may negate, in part, his *willful* failure to perform certain duties, this assertion does not change the fact that he conceded to "dishonesty or misconduct . . . in the performance of his[] duties," which is sufficient to meet the definition of just cause. *See* P. App. 25-26 (2015 LTIP); *id.* at 47-48 (2016 LTIP).

In sum, Romo has failed to designate specific facts demonstrating that there is a genuine fact issue, and the evidence before the court would only permit a reasonable trier of fact to find that Romo was terminated for just cause.

ii

Romo also posits that, regardless whether his termination was for cause, the shares granted to him under both LTIPs vested upon the consummation of the merger between Progressive and Waste Connections and should have been paid to him in 2017. Under the

2015 LTIP, Progressive granted Romo 721 Performance Share Units and 569 Restricted Share Units; under the 2016 LTIP, Progressive granted Romo 1165 Performance Share Units and 595 Restricted Share Units.

With respect to the Performance Share Units, each LTIP provides:

> If the Change in Control occurs prior to the Vesting Date, the Participant's Performance Share Units and related Dividend Performance Shares Units shall be deemed to be earned at the target level, and shall be redeemed at the earlier of the Vesting Date and the termination of employment by the Corporation without Just Cause or if the Participant resigns in circumstances constituting constructive termination . . . , in each case, within twelve months following a Change of Control.

P. App. 35 (2015 LTIP); *id.* at 57 (2016 LTIP). Romo's reading of this provision is that "the Performance Share Units vested upon the consummation of the merger, and should have been paid out no later than June 1, 2017 regardless of whether the termination was for cause." But the plain language of this provision does not state or imply that a change in control would alter the vesting dates—April 1, 2018 for the 2015 LTIP and February 22, 2019 for the 2016 LTIP. Rather, it concerns the performance metrics on which the vesting dates were conditioned. *See id.* at 29 (defining the vesting date of the Performance Share Units granted under the 2015 LTIP to be "conditional on achievement of the Performance Measures and the satisfaction of any additional vesting conditions established by the committee[.]"); *id.* at 51 (same for 2016 LTIP). Thus because Romo was neither employed at the vesting dates, nor terminated without just cause, he is not entitled to the 2015 LTIP or 2016 LTIP Performance Share Units.

With respect to the Restricted Share Units, each LTIP provides:

> [i]f the Change in Control occurs prior to the Vesting Date: (i) If the employment of a Participant is terminated by the Corporation without Just Cause or if the Participant resigns in circumstances constituting constructive termination . . . , in each case, within twelve months following a Change of Control, the Restricted Shares shall become fully vested; and (ii) If the surviving, successor or acquiring entity does not assume or substitute for the Restricted Shares on substantially the same terms and conditions (which may include settlement in the common stock of the successor corporation), the Restricted Shares shall become fully vested immediately upon the Change of Control if the Participant is then employed by the Corporation or a subsidiary.

*Id.* at 36 (2015 LTIP); *id.* at 58 (2016 LTIP). Romo points to a presentation given to management employees before the merger as evidence that "the latter of these two options was elected" and the restricted shares vested upon the change in control. P. Br. 22. The presentation states "IF [Change in Control] and termination, calculated on the basis it is fully vested. If so: RSUs: calculated at share price at termination, subject to sale in the market." P. App. 88. The plain language of this presentation does not support Romo's argument. Indeed, the language supports the *opposite* conclusion, because it discusses a change in control *and termination*, which can only implicate the first option, mandating vesting if employment is terminated without just cause within 12 months following a change of control. Romo was terminated within 12 months following a change of control. Yet, as described *supra* at § IV(B)(2)(i), the evidence before the court only permits the conclusion that Romo was terminated for just cause. Thus Romo is not entitled to recover the 2015 LTIP or 2016 LTIP Restricted Share Units.

- 19 -

Accordingly, the court grants defendants' motion for summary judgment on Romo's claims for breach of the 2015 LTIP and breach of the 2016 LTIP.

* * *

For the reasons explained, the court grants defendants' motion for summary judgment and enters judgment in favor of defendants dismissing this action with prejudice.

**SO ORDERED**.

August 9, 2019.

                                                SIDNEY A. FITZWATER
                                                SENIOR JUDGE